UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF ARKANSAS

HOT SPRINGS DIVISION

US DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

OCT 2 4 2025

Ronald E. Dowling
By_____
Deputy Clerk

GAIL PARKERSON,


PLAINTIFF


v.                                    Civil Action No. 6:25-cv-06112-SOH


HS STAYBRIDGE HOTEL LLC, and any other names the hotel was under on 10/25/2024,


IHG MANAGEMENT (MARYLAND) LLC,


HALEY DENISE TALMON, Individual and Official Capacity as General Manager of Staybridge

Suites Hot Springs, and any other names the hotel was under on 10/25/2024,


GARLAND COUNTY, a governmental entity, which oversees the Sheriff's Department,


GARLAND COUNTY SHERIFF MIKE MCCORMICK, Individual and in his Official capacity,

over those in his department,

INVESTIGATOR CHASE MATTHEWS, Individual and Official, as Deputy Chase Matthews
during the event of 10/25/2024,;

JOHN DOES 1–25, which may be named after possible discovery.

DEFENDANTS

1.

## PARTIES

1. **Plaintiff**, Gail Parkerson, is a resident of Arkansas and was 72 years old at the time of the events described herein.

2. **Defendant HS Staybridge Hotel LLC** is a hotel operating in Garland County, Arkansas, d.b.a. Staybridge Suits Hot Springs and is subject to suit for the acts of its employees and agents, under Arkansas Law.

3. **Defendant IHG Management (Maryland) LLC** is believed to be the U.S.-based operator or manager of HS Staybridge Hotel LLC. Plaintiff has named this domestic entity to avoid the complications of serving the parent company, InterContinental Hotels Group PLC, located in the United Kingdom. Plaintiff reserves the right to amend this complaint should discovery reveal involvement by additional IHG entities.

4. **Defendant Haley Denise Talmon** is sued in her individual capacity and in her official capacity as General Manager of **HS Staybridge Hotel LLC** at the time of the events described in this Complaint, as she was the acting General Manager, at the time of the event October 25, 2024.

5. **Defendant Garland County** is a governmental entity responsible for law enforcement and oversight of the Garland County Sheriff's Office. It is subject to suit under **42 U.S.C. § 1983** for policies, practices, and customs that caused or contributed to the violations alleged herein, as well as Sheriff's Office policy, custom, or practice that led to the violation of Plaintiff's rights — or failed to train or supervise properly — the County can be held liable under *Monell v. Department of Social Services.*

6. **Defendant Garland County Sheriff Mike McCormick** is the head of the Sheriff's Office employed by the Garland County Sheriff's Office.  He is sued in both his individual capacity, for

his actions taken under color of state law, and his official capacity, as an agent of Garland County. The Sheriff knew about the misconduct of the deputy due to Plaintiff's detailed email to him, and failed to act, which supports a claim of deliberate indifference.

7. **Defendant Investigator Chase Matthews** is a law enforcement officer employed by the Garland County Sheriff's Office. He is sued in both his individual capacity, for actions taken under color of state law, and his official capacity, as an agent of Garland County. At the time of the incident on October 25, 2024, Matthews was serving as a Deputy. **Individual Liability** against the Deputy: for the threats of arrest, abandonment, and disregard for Plaintiff's safety — all under color of law, and for violated rights. Plaintiff alleges that his subsequent promotion to Investigator reflects institutional endorsement of the misconduct described herein.

8. **Defendants John Does 1–25** are individuals whose identities are currently unknown but who participated in or were responsible for the conduct described herein. This may include front desk staff such as "Linda," whose role in the events is not yet fully known. Plaintiff will amend the complaint to name these individuals, if needed, when their identities are discovered.

Plaintiff brings this action pursuant to **42 U.S.C. § 1983** and related state law claims to seek justice for violations against her constitutional rights and to help promote change.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to **28 U.S.C. § 1331**, as Plaintiff brings claims arising under the Constitution and laws of the United States, including **42 U.S.C. § 1983**.

This Court has supplemental jurisdiction over Plaintiff's state law claims under **28 U.S.C. § 1367(a)**, as those claims are part of the same case or controversy under **Article III of the United States Constitution.**

Personal jurisdiction exists over all Defendants because they reside in, conduct business in, or committed the acts complained of within the State of Arkansas and this District.

Venue is proper in the **Western District of Arkansas, Hot Springs Division**, pursuant to **28 U.S.C. § 1391(b)**, because a substantial portion of the events or omissions giving rise to the claims occurred in Garland County, Arkansas.

**3.**

# INTRODUCTION

## WITH BRIEF HISTORICAL BACKGROUND

Years ago, Plaintiff bred Thoroughbred horses at her farm in Hot Springs, Arkansas. She once

contacted the Garland County Sheriff's Department's Mounted Patrol about donating two of her horses

to them. The head of that group visited Plaintiff's farm, where she made it clear, she would never want

the horses sold for slaughter. The man replied, "Ms. Parkerson, you have no say in what happens to

those horses." Plaintiff simply responded, "Then, you can't have them."

In 2001, following the death of Plaintiff's Father, she left town for about a month after making

arrangements for her horses. While away, her horses were removed from her farm in the night. Upon

her return, Plaintiff was arrested and charged with Animal Cruelty, despite not being the one caring for

the horses, while gone, and despite the allegations being false. Her stallion was 25 years old, at the

time. Plaintiff's Father, a medical doctor in Hot Springs for over 50 years, had advised her not to treat a

racing injury the stallion sustained at age four, and he was right. Plaintiff's case was dismissed,

prompting a multitude of deputies to quickly exit the courtroom. Afterward, Plaintiff was informed that

the Mounted Patrol had planned to sell her horses for slaughter to fund a field trip to New Orleans,

though she cannot confirm the accuracy of that statement. Her horses were ultimately returned to her

farm.

Though years had passed, since the events surrounding her horses, Plaintiff's experiences in Hot

Springs continued to be marked by sudden and unjust treatment — as evidenced by the events of

**4.**

October 25, 2024. On that day, Plaintiff was already checked into a hotel in Hot Springs, having already stayed a week and was about to begin her second week of another paid-in-full reservation. Sixteen minutes, before, the second week was to begin, the General Manager called and told her she had to leave. Plaintiff was told it was due to bad reviews she had allegedly written, though she had written none. After that was found out to be a mistake, she was told it was because she was from Hot Springs. Realizing conversation was futile, Plaintiff ordered a rental SUV and began packing her belongings, with one trolley out front and another mostly-filled by her door.  Before she could finish, and unknown to her, at the time; the General Manager called 911, and a deputy arrived.

### Factual Allegations

1. On Friday, October 18, 2024, plaintiff arrived at Staybridge Suites Hot Springs to a one week reservation through Price Line - answered a multitude of questions asked at the front desk by a nice lady named Mickey about where she was from and what she was going to be doing. Plaintiff answered all her questions and mentioned, that she just wanted to rest.

2. On Tuesday, October 22, 2024, plaintiff made another reservation through Price Line to extend her stay a second week after the first week, with all paid-in-full, up to November 1, 2024.

3. On or about Wednesday, October 23, 2024, plaintiff was given a key to a storage closet, by Linda - front desk, so plaintiff could unload her items from her Enterprise rental SUV, before returning it back, early Friday morning, before the start of her second week at Staybridge Suites Hot Springs, since she just wanted to rest and would not have need for an SUV, that week.

4. On Thursday, October 24, 2024, plaintiff accomplished the unloading of the SUV, with all put in the storage closet, and also purchased groceries and snacks from the store for the week, since she would no longer have the SUV, as told to the front-desk.

5. Early morning, Friday, October 25, 2024, the plaintiff returned her SUV rental to Enterprise, as planned, around 8:30 AM, with Enterprise driving her back to Staybridge, where she had breakfast.

6. On or about 11:44 AM as shown on plaintiff's phone, defendant Talmon, as General Manager of Staybridge Suites Hot Springs, (HS Staybridge Hotel LLC) called the plaintiff on plaintiff's cell phone

**6.**

and told her, that plaintiff had to leave. Plaintiff asked why, and defendant said it was because of the

plaintiff's bad reviews, she had written about Staybridge. Plaintiff told the defendant, that she

(plaintiff) had not written any reviews at all, about Staybridge. When defendant acted as if she did not

believe the plaintiff, then, plaintiff asked her to read one of the reviews to her. Defendant agreed and

went to get the reviews. She returned stating, that it was a mistake; as it was the guy, who stayed in

plaintiff's room before her, who had written the bad reviews.


7. Defendant stated to plaintiff, that she would still have to leave, because she (the plaintiff) lived in

Hot Springs, Arkansas. Plaintiff explained, she had told all of this, when she checked in, about living

in Florida for about 6 to 7 years, and had come back to Hot Springs. Defendant told the plaintiff; she

still had to leave, right then, or defendant would get the Sheriff's Department out there to get the

plaintiff for Trespassing. Plaintiff was going to leave, but told defendant she would need some time to

pack and arrange for another SUV to be brought to her from Enterprise to pack.


8. Defendant Talmon further told the plaintiff, that her uncle, or some relative of hers, worked for

the Sheriff's Department, and that he would do, what she (Talmon) wanted done. After that, defendant

Talmon told plaintiff to; Leave her groceries, there.


9. Plaintiff explained, she would have to call Enterprise to rent another SUV, and that Fridays were

their busy day. She started trying to reach Enterprise at 12:59 PM, between the time, plaintiff was

repacking and loading the luggage-trolleys, with one already taken outside, and a second one partially

filled by the plaintiff's room door.


7.

**10.** Unknown to Plaintiff, at approximately 3:00 PM, Defendant Talmon made a 911 call stating

that Plaintiff was trespassing, refusing to leave, and was no longer a paying guest. However, before that

time, Plaintiff had already taken a very heavy luggage trolley down the hallway, into the elevator,

through the lobby, and out past the front doors. She had returned to her room and was in the process of

filling a second trolley, which was almost full, with additional items gathered and ready to be packed.

Despite this clear evidence of her intent to leave, Defendant falsely reported that Plaintiff was refusing

to vacate. (Plaintiff did not learn of the 911 call until about a month later, in December, when she

obtained the dispatch records through an FOIA request. **Exhibit C.**

11. Deputy Chase Matthews of the Garland County, Arkansas Sheriff's Department, accompanied

by Defendant Talmon, approached Plaintiff's room. Before knocking, Deputy Matthews observed and

commented on the almost full luggage trolley outside Plaintiff's door, acknowledging that she was in

the process of packing. Upon knocking, Plaintiff answered. Deputy Matthews asked, was going on, and

Plaintiff said, she was trying to get out of there. Deputy asked, if she was leaving, to which Plaintiff

replied, "Yes — I don't have any choice." Plaintiff explained she was very tired, (as she had changed

into comfortable clothes to continue packing in preparation for loading the SUV upon its arrival).

Notably, Deputy Matthews contacted dispatch stating, "Last name: Parkerson. First name: Jail."

Plaintiff heard what was said, but she made no comment about it. **Body Cam Video Time-Stamp**

**15:29:06.**

While in Plaintiff's room was the first time the deputy threatened plaintiff, he was going to take her to

jail for trespassing, if she did not leave, right then. Though she explained, she was waiting for the SUV

from Enterprise to arrive to load her belongings to be able to go. When the Deputy threatenedto arrest

Plaintiff for trespassing, if she did not leave immediately, Plaintiff responded, "How can I be

trespassing, when I'm paid up to next Friday?" The Deputy did not dispute this and instead looked to

**8.**

Defendant Talmon, the General Manager, for direction. This exchange, captured on body cam footage, demonstrates that the Deputy was aware Plaintiff was a lawful guest and nonetheless continued to act on Defendant Talmon's false representations. This exchange demonstrates the deputy's reliance on false information provided by the hotel and his readiness to act on it without verifying the facts. At one point, the Deputy asked Talmon; "What do you want from me?" **Body Cam Video Time-Stamp 15:36:14.**

Plaintiff's lawful status as a paying guest was ignored, and her rights were placed at the mercy of a private party's misrepresentation. **Exhibit B. Reservation Confirmation for the dates of October 25, 2025 to November 1, 2024.**

    **13.** The Deputy asked Defendant Talmon, if Plaintiff ever got physical with her? And Talmon said, no. **Body Cam Video Time-Stamp 15:30:49**

    **14.** That Plaintiff showed Deputy Matthews proof of payment for her stay on her cell phone, confirming she was a lawful guest at the hotel. Despite this, the Deputy continued to act on Defendant Talmon's false claim that Plaintiff was trespassing. **Exhibit I body cam and Exhibit D & E from Enterprise. Body Cam Video Time-Stamp 15:37:36**

    **15.** While still in her room, Plaintiff stated, "Can I go to the bathroom?" In response, Deputy Matthews turned to Defendant Talmon and asked, "Is that okay?" before allowing Plaintiff to proceed. This exchange, captured on body cam footage, demonstrates that Plaintiff was not free to move without permission and that law enforcement deferred authority to a private individual. **Body cam video time-stamp 15:43:31**

**9.**

16.  That while still in the Plaintiff's room, Plaintiff mentioned she would need a refund for the week, so, she could get another place to stay.  Defendant Talmon stated, Plaintiff would probably have it in ten days.  Plaintiff replied, she would need it, now, because she did not have any place, else, to go.  The Deputy suggested they allow the Plaintiff to stay the second paid week and then, go.  Plaintiff agreed, because that would give her time to make other arrangements.  Defendant Talmon looked down and ignored the Deputy's suggestion, and the Deputy dropped the idea.  **Exhibit I & B.**

17.  The Deputy asked Defendant Talmon, if she had ever done this to anyone else? Defendant replied, "Yes, lots of times." He continued asking her; "even when they paid?" **Body Cam Video Time-Stamp around 15:36:35** And Talmon replied, yes, that she made people leave right in the middle of their reservations, which is what she was doing to Plaintiff." "Cancel and refund, happens all the time," Talmon said.  **Body Cam Video Time-Stamp 15:36:15** Talmon continued; "I've called the Sheriff's Department many times to remove others trespassed, even those who paid. The deputy also stated, that Plaintiff had not done anything criminally wrong, and later said, he didn't see that she did anything wrong.  (referring to Plaintiff) **Body Cam Video Time-Stamp 15:25:23 & 15:32:23** He said it would be a civil suit.  **Exhibit I**  Meanwhile, the Deputy continues to cut Plaintiff off from her trying to answer or say anything. **Body Cam Video Time-Stamp 15:30:50, 15:31:57- 15:33:48 -15:34:25**

Plaintiff's cat, Kitty Lee, cried the entire time the three were in Plaintiff's room. Plaintiff asked the deputy, if she could let her cat out of the cat carrier, however, the Deputy said no.  **Body Cam Video Time-Stamp 15:34:40.** The Deputy began being  rude in his comments to Plaintiff, as if putting her down, and how no one would let her stay there, so, she might as well go on, as if he were advising

**10.**

Plaintiff to leave town. That it wasn't against the law to be homeless or a non-resident. Plaintiff wondered, if this treatment was linking the past with when the Garland County Sheriff's Department wanted to sell her horses for slaughter for money, but failed? And wondered if Defendant Talmon's relative, she had told Plaintiff worked at the Sheriff's Office and "would do what she wanted done" had a connection with it all? **See Introduction. Exhibit I & G** Plaintiff recalled hearing that the reason, they had wanted to sell her horses for slaughter, was to have more money for their field trip to New Orleans, and it was someone close to that group, who told Plaintiff about it.

The Deputy kept giving answers to Defendant GM Talmon, for his questions to her. **Body cam video time-stamp 15:38:37, 15:41:30-15:42:50**

19. The Deputy asked if I would be comfortable with Defendant GM Talmon helping with my things, and Plaintiff said <u>No</u>. **Body Cam Video Time-Stamp 15:42:39** Then, told Plaintiff, when you leave the property, you will be trespassed. She did not fully understand what he meant by that statement. He helped her load some items on the luggage-trolley, acting impatient with her. Plaintiff was trying to calm the deputy down, by keeping low-key and calm, herself, at least on the outside. The process began and continued with the taking of other trolleys, outside. **Exhibit I- body cam video.**

20. The deputy appeared frustrated with the 72 year old plaintiff, - moving slower, and hurried her. In part of the body cam video, in the elevator, one can see Plaintiff shaking. **Body Cam Video Time-Stamp 15:07:22 -15:07:41.** With packing done, Plaintiff was paraded through the hall, elevator, and lobby on the way outside, with the Deputy close behind her, back and forth. His voice was loud. People were just staring. Outside, the Deputy asked, if Plaintiff wanted him to call LifeNet for her? She replied, "No." She knew there would be no one there to take care of her cat or luggage and boxed items, sitting in the luggage-trolleys, in front of Staybridge, if she had said, "Yes."

**11.**

**Exhibit I.** This brief acknowledgment demonstrates the visible seriousness of Plaintiff's condition. Plaintiff was physically and emotionally depleted. The deputy's recognition of her condition lasted only a moment — after which he denied her access to her purse, left her without shelter, and walked away, fully aware of her vulnerability.

21.  While packing, Plaintiff had given her purse to the deputy and asked him to hang it from the top rung of the trolley, which he did.  In leaving two or three trolleys outside, the Plaintiff noticed her purse was missing.  The Deputy walked Plaintiff over to the far side of the Staybridge property and told her to stay there, after she asked, if she could go over to the luggage-trolleys and look for her purse.  He replied; if she went over there to look for her purse in her items on the luggage-trolleys, that he would take her to jail, right then.  **Body Cam Video Time-Stamp 16:13:45 & 16:15:10** Only minutes later, **16:16:45** the Deputy told Defendant Talmon, that if Plaintiff comes back up, she'll be arrested. Outside, he, again told Defendant Talmon; if Plaintiff comes back, she will be arrested.  Plaintiff knew her purse had her credit card and cell phone in it, which she needed, and let the deputy know it, as Enterprise would have to be paid for the second SUV from them, and for everything else, as well, as her phone was the only way she had to call them.  The Deputy told Plaintiff, she had to leave even without her purse.  **Body Cam Video Time-Stamp 16:12:38** Plaintiff did not go to look for her purse in the luggage-trolleys, because she did not want to risk being arrested.  She just stood there, watching her cat carrier, from a distance, until they finally allowed her to have her cat, in its carrier, beside her. She couldn't let the cat out in the outside, because she would have run. The stress was unbelievable. She was trapped and didn't know what to do.

22.  That before, the Deputy left, he turned around to the Plaintiff and stated; "Every five minutes,

**12.**

you said, "I'm not leaving." At which point, Plaintiff, still remaining calm, stated that wasn't true,

because the Plaintiff knew she was packing to leave. The Deputy left. Her purse was still missing.

There would be no way to call for help. In checking the video, after her FOIA request was answered in

December, Plaintiff was right, she never said she was not leaving. She had remained composed, on the

outside, the whole time, capitulating but losing faith in people, she would never trust, again. There

would be no way to pay for the SUV or anything else.


23. After the Deputy departed, Defendant Talmon walked up to the Plaintiff at the front edge of the

Staybridge property and told the Plaintiff, she could go over to the luggage-trolleys and look for her

purse. (This fact is very important, when you realize the last thing the Deputy told Defendant Talmon,

was that if the Plaintiff were to come back on the property, she would be arrested for trespassing).

**Body Cam Video Time-Stamp 16:13:40, 15:45:15** Plaintiff, recalling what the deputy had just stated

to her, said she would need a note from Talmon to be able to do so. Defendant Talmon went back

inside Staybridge and came back out with a sheet of paper loosely held longways, and told the Plaintiff

to go ahead and go look for her purse in her items, now.


24. Plaintiff stated to Talmon, that Plaintiff would need to read the note and hold it. With that,

Defendant Talmon made the statement to Plaintiff; "If I have to call the Sheriff's Department, again, it

will not go well with you." Plaintiff did not respond. She knew, she had no choice, but to stay and be

still, or lose her cat and items, as a prior call the Deputy had made, was heard, earlier, where she would

be made to leave her items behind, if that was what it took to get her out of there. **Body Cam Video**

**Time-Stamp 15:55:10-15:57:46 and 16:12:38-16:13:40 Deputy speaking to Plaintiff.**

**13.**

25. Defendant Talmon, then, asked Plaintiff, if she had one of Defendant Talmon's cards?  Plaintiff replied, maybe, but she did not know where. At that point, Defendant Talmon handed the Plaintiff the Defendant's card and said, "I know you will want to call me."  **Exhibit K. Defendant Talmon's business card.  Exhibit H, the Plaintiff's email to Garland County Sheriff Mike McCormick.**

26. Plaintiff very calmly asked why Talmon had told the Deputy, that they had had to manhandle her, to get her out of the kitchen?  Talmon grinned and said, "I guess it got lost in the translation."  Earlier, when, Talmon, and the Deputy were still in the hotel room with Plaintiff; the deputy had asked Defendant Talmon, if there had been any physical confrontation by Plaintiff, and Talmon answered, no.

27. While Plaintiff did not react to Defendant Talmon's requests, Defendant brought Plaintiff's purse to the Plaintiff without comment, and Talmon began taking Plaintiff's items off of the luggage-trolleys, one at a time, and placing and/or dropping them on the grass and dirt area, including clothes, in front of the hotel, while some incoming guests were laughing at Plaintiff's circumstances.  Others she had met, the week before, looked puzzled and just watched Plaintiff, while another young man called the Sheriff's Department on Plaintiff's behalf, trying to get help for the her.  **Exhibit J. Pictures.**

28. Though Plaintiff was still shaky, she got a few pictures, outside, with her phone back.  The guy from Enterprise arrived and started helping Plaintiff load her items into the second SUV, when he saw she was in bad shape.  Plaintiff knew this, because usually, employees don't help load items into the vehicles.  Plaintiff's clothes were soaked from sweat.  Her sparse hair, was stuck flat to her head and her face was swollen, but at least, a little less distorted than it had been from all of the over-activity, stress, and intentional harm meant for her, which she just couldn't understand.  **Exhibit J. Pictures.**

**14.**

That day, it was easy to look at Plaintiff and know, she had been diagnosed with cancer. She had not followed any protocol, however, avoided stress and made a point to rest.

29. The young man from Enterprise drove them back to the Enterprise office, and once the Plaintiff signed whatever was necessary, she drove away, only to park and wonder why all of that had just happened to her and where she might go? She was too shocked to be angry, at that point, however, she couldn't shake that feeling of losing all personal safety. She didn't know, if the Sheriff's Department was going to find her and arrest her for parking in a parking lot, over night, or not, but she hoped they wouldn't find her. She had no other place to go.

30. That night, with no refund of her week's stay, then, and the two amounts paid to Enterprise, (totaling $1541 or so, the Plaintiff ended up staying the night in the packed SUV rental in a parking lot, it was too warm, but she was scared to have the windows down, since she might not be able to stay awake and keep from being attacked in the night, if she did. Her Kitty Lee was still anxious and cried some, though finally stopping all sound, until daylight. She was exhausted, too.

31. While Plaintiff only had Burger King's bathroom to use, which was very embarrassing, at one point, she drove past Staybridge and witnessed a very full parking lot, when it hadn't been that way. Plaintiff wondered, if a large group had reserved many rooms, where they needed her reserved room for someone else? Or if it was just the raising of the price of the room to make more? Or expectation of more pet-fees paid, regardless of the length of the reservation. **Exhibit G. Paid pet fee. Exhibit H. Plaintiff's Email to the Sheriff.**

**15.**

**32.** That night, she sat low in the driver's seat, so no passing car could see her. She watched as patrol cars went by, thankful that they just kept going. She did not know what they would do, if they stopped and found her. The time crawled by, and she kept risking it by opening the window a few inches lower, so it would be cooler. She tried to imagine how much room a man's arm would need to be able to reach inside and grab someone by their neck. She called Price Line, but they did not appear to care.

33. On **December 11, 2024**, Plaintiff emailed Sheriff Mike McCormick. This is a **Summary of Exhibit H – Plaintiff's Email to the Sheriff.** Plaintiff submitted a detailed, time-stamped email to Garland County Sheriff Mike McCormick recounting the events of October 25, 2024, involving her eviction from Staybridge Suites (HS Staybridge Hotel LLC) and her interaction with Deputy Chase Matthews. The email describes:

- Plaintiff's valid, prepaid reservation for a second week at the hotel.

- The General Manager's shifting and unsupported reasons for eviction, including mistaken identity and Plaintiff's local residency.

- Plaintiff's offer to cooperate with law enforcement, including a suggestion to wear a wire and call the GM.

- The deputy's threat of arrest for trespassing despite acknowledging Plaintiff's paid status.

- The GM's false statements about Plaintiff's conduct and her claim of having video evidence, which Plaintiff disputed.

- The deputy's refusal to allow Plaintiff access to her belongings, including her missing purse, under threat of arrest.

**16.**

- The GM's alleged mistreatment of Plaintiff's property and her statement implying influence over the Sheriff's Office through a relative.

- Plaintiff's physical exhaustion, emotional distress, and concern for her safety during the incident.

This contemporaneous account was written before Plaintiff became aware of the false 911 call and reflects her genuine understanding of the situation at the time. It supports claims of breach of contract, abuse of process, emotional distress, and civil rights violations.  However, there was no response to Plaintiff's email, from the Sheriff, <u>except for the promotion of  Deputy Matthews to Investigator.</u> Plaintiff could not understand it.

34. With the detailed account of Plaintiff's email to Sheriff Mike McCormick describing Defendant Deputy Chase Matthews' misconduct during the October 25, 2024 incident at Staybridge, and despite the seriousness of the allegations, Matthews was subsequently promoted and reassigned to the role of Investigator within the Garland County Sheriff's Department. This places Matthews in a position of increased investigative authority and discretion. This decision, made after receiving Plaintiff's complaint, reflects a troubling pattern in which the Department <u>appears to protect its personnel rather than hold them accountable</u> — <u>reinforcing a culture of impunity and undermining public trust.</u>

35. That Plaintiff later learned that the 911 call initiating law enforcement involvement was made by Defendant General Manager, Haley Denise Talmon;  that the information provided was false and misleading. This discovery occurred after Plaintiff had been removed from the premises, and about a month, later, under an FOIA request reply.  **Exhibit C.**  In the audio portion of the 911 call, Defendant

17.

36. Talmon told the 911 dispatch; that she had given plaintiff *since* **9 AM**, to be out of there. And she said she called Plaintiff at 9 AM., that day. However, according to the time stamp on Plaintiff's cell phone of that call from Defendant Talmon's Staybridge hotel phone to Plaintiff's cell phone was **11:44 AM**. That is two hours and 44 minutes, after when she said that, and 16 minutes before the second week's reservation would begin, which the General Manager knew was already paid-in-full, when she called to have her leave. **Exhibit L**

37. Under that same FOIA request, Plaintiff learned, the body cam video showed, around 3:18 PM, the deputy first arrived at the Staybridge lobby, that he asked when Plaintiff was supposed to leave, and Talmon said that Plaintiff's check-out time was that day (Friday, October 25, 2024), instead of telling him the actual paid-for check-out date of Friday, November 1, 2024. Defendant Talmon was aware of Plaintiff having paid for a second week's extension. However, the video will show, she did not tell that fact to the Deputy. Defendant Talmon said to the Deputy; she (Plaintiff) paid for seven days, and she got seven days. She concealed the fact that Plaintiff's second week was paid. This information was obtained from the FOIA request, later. **Exhibit A & B & C & I.** However, after Talmon and the Deputy traveled to Plaintiff's room, and though the Deputy was genuinely surprised, when he heard the Plaintiff, say, she had paid for another week; the Deputy stated, "She (Talmon) even told me; you have another reservation. This was not a truthful statement by the Deputy. This was just after the time the Deputy had stated, that Plaintiff hasn't done anything wrong, and that this was not striking him as a criminal issue. **Body Cam Video Time-Stamp 15:28:05 – 15:28:05.**

o

38, Given the fact the Deputy had stated, that Plaintiff hasn't done anything wrong, and that this was not striking him as a criminal issue, **Body Cam Video Time-Stamp 15:28:05,** after what

18.

happened at the hotel, attention shifts to the system that made it possible. The "Staybridge Suites" portion of the name appears throughout the booking process, from Priceline to confirmation, all pointing to IHG's infrastructure and branding. When, the last real name it had was HS Staybridge Hotel LLC. The hotel operated under Staybridge Suites and the Staybridge Suits Hot Springs, which was a fictious name, as the real name was HS Staybridge Hotel LLC, using shared tools and marketing. Plaintiff relied on that connection when making the reservation. What followed came from that system — not just from one party, but from how they worked together.

39. Looking at it all, Plaintiff had checked in to the hotel referred to as *Staybridge Suites Hot Springs,* where the majority of the events of this complaint took place. Located at 103 Lookout Circle in Hot Springs, Arkansas, 71913, and publicly operating under that name. It presented itself as a Staybridge Suites property, consistent with IHG's branding, reservation systems, and customer-facing materials. The entity previously associated with the hotel, HS Staybridge Hotel LLC, was dissolved on February 13, 2024, according to records from the Arkansas Secretary of State. No new entity was registered to replace it. Despite this, the hotel continued to operate under the Staybridge Suites name, with Plaintiff relying on that continuity when making the reservation. There was no public indication that the legal structure behind the hotel had changed. Plaintiff even enrolled with IHG as a member at the time of check-in. The reservation was made through Price Line, which utilized IHG's reservation system to facilitate the booking — further reinforcing Plaintiff's reasonable belief that the hotel was part of a legitimate, branded system. Pursuant to Arkansas law, a dissolved limited liability company remains subject to suit for conduct arising before or after dissolution, including post-dissolution conduct tied to winding up or continued operations, and may be served through its last registered agent of record. Accordingly, HS Staybridge Hotel LLC may be served for purposes of this action through its last registered agent, Shashwat Goyal, as listed with the Arkansas Secretary of State, who is now, also, the acting General Manager of the hotel, which is what Plaintiff will do.

19.

40. So, the truth is: Defendant HS Staybridge Hotel LLC, doing business as Staybridge Suites Hot Springs, is the local entity that owns and/or operates the hotel where the events in this Complaint occurred. This entity accepted Plaintiff's payment for an extended stay and is directly responsible for the conduct of its employees, including the General Manager who initiated the false 911 call and directed Plaintiff's removal from the premises.

Defendant IHG Management (Maryland) LLC is believed to be the U.S.-based management company responsible for overseeing operations at HS Staybridge Hotel LLC. As a subsidiary of InterContinental Hotels Group, IHG Management (Maryland) LLC exercises control over policies, training, and brand standards at Staybridge Suites properties in the United States, including the Hot Springs location. Accordingly, it shares responsibility for the actions taken by hotel staff and the resulting harm to Plaintiff.

41. On December 10, 2024, Plaintiff learned how to file a Freedom of Information Act (FOIA) request and submitted FOIA Request No. 24-1179 to the Garland County Sheriff's Office. The request stated:

> "I would like a call for service on or about Friday, October 25, 2024, around the
> approximate starting time of 1 PM, and the following hours, to the StayBridge Suites Hot
> Springs, located at 103 Lookout Circle, Hot Springs, Arkansas 71913. I need the deputy's
> name who made that call, as well as any and all reports, documents, photo's, emails, texts,
> videos, data, and all other records which do, or might, pertain to this call by the Garland
> Country Sheriff's Office. Thank you."

Plaintiff submitted this request to obtain information about the law enforcement response that occurred on October 25, 2024, and to better understand the circumstances surrounding the deputy's involvement.

20.

### Turning Point: Discovery of the False 911 Call

Plaintiff's understanding of the events surrounding her removal shifted dramatically upon discovering that a false 911 call had been made. Until that moment, Plaintiff had endured the ordeal with confusion and fear, trying to make sense of the treatment she received. But learning that the call — the catalyst for law enforcement's involvement — was based on falsehoods triggered a profound emotional response. It was not merely a mistake. It was a deliberate act that re-framed the entire experience as one of targeted harm.  It made her wonder, just how far back it went?

This realization brought clarity, but also deep pain. The fear Plaintiff had felt while sleeping in a rental SUV in a parking lot, watching for patrol cars, was no longer abstract — it was justified. The Freudian Slip from Deputy Matthews in the dispatch call referring to her as "Jail," instead of Gail, and the veiled pressure to leave town were not isolated incidents. They were part of a chain reaction set in motion by a false report, much like the past charges linked to a past case involving Plaintiff's own horses.

The emotional impact of this discovery was severe. Plaintiff experienced a surge of distress, anger, and betrayal. What had once felt like chaos now revealed itself as calculated. This turning point intensified Plaintiff's trauma and solidified her resolve to seek justice. It marked the moment when survival turned into advocacy — when Plaintiff began to confront the full scope of what had been done to her and her pet.

With this deeper understanding of the events and motivations behind her removal, Plaintiff now sets forth the specific conduct of each Defendant that contributed to the harm she suffered.

21.

## Individualized Allegations

- **HS Staybridge Hotel LLC**

HS Staybridge Hotel LLC, located at 103 Lookout Circle, Hot Springs, Arkansas 71913, is registered with the Arkansas Secretary of State under HS Staybridge Hotel LLC, d.b.a. Staybridge Suites and Staybridge Suites Hot Springs LLC, and was the physical site of the October 25, 2024 incident and the operating entity where Plaintiff was unlawfully evicted. The hotel, under the management of Haley Denise Talmon, at the time of the incident, initiated Plaintiff's removal despite Plaintiff having paid for her stay and behaving calmly and cooperatively. Plaintiff had paid all required charges, including the $75 pet fee, which had been accepted by the hotel prior to the eviction. This further disproves the claim that Plaintiff was a non-paying guest and highlights the arbitrary nature of her removal.

The hotel falsely reported Plaintiff as a non-paying guest refusing to leave, triggering a law enforcement response that resulted in threats of arrest, denial of access to property and pet, and public humiliation. The hotel's conduct violated basic principles of hospitality, contractual obligations, and constitutional protections. It permitted discriminatory and arbitrary treatment of Plaintiff, including shifting justifications for eviction, refusal to assist with property removal, except in a small way, and dumping of Plaintiff's belongings on the dirt and grass in front of the hotel.

As a branded franchise of IHG Hotels & Resorts, HS Staybridge Hotel LLC was bound by corporate standards of ethical guest treatment, which it failed to uphold. The hotel's actions — including the false report, denial of access, and public mistreatment — directly contributed to Plaintiff's emotional distress, deprivation of property, and violation of civil rights. HS Staybridge Hotel LLC is liable for the

22.

conduct of its employees and agents under principles of agency, breach of contract, and tort liability.

Key Allegations Against HS Staybridge Hotel LLC

- Physical site of Plaintiff's unlawful eviction on October 25, 2024

- Falsely reported Plaintiff as a non-paying guest despite confirmed payment

- Accepted all charges, including the $75 pet fee, prior to eviction

- Triggered law enforcement response resulting in threats of arrest and denial of access to property and pet

- Permitted discriminatory and arbitrary treatment of Plaintiff

- Dumped Plaintiff's belongings on dirt and grass in front of the hotel

- Violated hospitality standards, contractual obligations, and constitutional protections

- Failed to uphold IHG brand standards for ethical guest treatment

- Liable for the conduct of its employees under agency and tort principles

- Directly responsible for Plaintiff's emotional distress and civil rights violations


IHG Management (Maryland) LLC

- IHG Management (Maryland) LLC is the corporate entity responsible for the oversight, operational standards, and parents brand standards and legal obligations but failed to do so. This inaction contributed directly to the breach of contract, emotional distress, and deprivation of property rights suffered by Plaintiff.

**23.**

- IHG is liable for the acts and omissions of its agents and representatives under principles of

- **agency**, **corporate negligence**, and **vicarious liability**. Its failure to intervene or correct the unlawful conduct of its franchisee demonstrates a breakdown in oversight and a disregard for the rights of guests staying at IHG-branded properties. By allowing its brand to be used in a manner that violated guest rights and constitutional protections, IHG contributed to the harm suffered by Plaintiff.

- Key Allegations Against IHG Management (Maryland) LLC policy enforcement of HS Staybridge Hotel LLC. As the franchisor, IHG owed a duty to ensure that its franchisees and personnel adhered to lawful, ethical, and non-discriminatory practices in guest relations. This duty is explicitly outlined in IHG's published **Code of Conduct** and policy documents, which apply not only to corporate and managed properties but also to franchised hotels.

- **IHG's Code of Conduct** states that "doing business responsibly is a core part of our culture" and affirms that "the principles, spirit and purpose of the Code are therefore relevant to all of IHG, including to our franchised hotels." The Code encourages fair treatment of guests, ethical behavior, and accountability. IHG also publishes a **Human Rights Policy**, **Supplier Code of Conduct**, and **Supporting Our Communities Policy**, all of which emphasize dignity, fairness, and responsible engagement with guests.

- Despite these standards, IHG failed to prevent or correct the unlawful eviction and mistreatment of Plaintiff. Talmon's conduct — including the false 911 call, discriminatory eviction, and public dumping of Plaintiff's belongings — violated IHG's stated principles. IHG had the authority to intervene and enforce compliance with its **Code of Conduct**, but did not

- Responsible for oversight and operational standards of the **Code of Conduct** and policies

**24.**

requiring ethical, lawful, and fair guest treatment

- **Code of Conduct** applies to franchised hotels and affirms accountability across the brand

- Failed to prevent or correct the unlawful eviction of Plaintiff

- Had authority to intervene but chose not to

- Contributed to breach of contract and emotional distress suffered by Plaintiff

- Liable under agency, corporate negligence, and vicarious liability

- Allowed its brand to be used in a way that violated guest rights and constitutional protections

- Demonstrated a breakdown in corporate oversight and accountability

- Failed to enforce compliance with legal and ethical obligations across its franchise network


- **Haley Denise Talmon**, the General Manager of HS Staybridge Hotel LLC, hereinafter referred to as "Staybridge" during the time of the October 25, 2024 event, was the individual who initiated Plaintiff's removal from the hotel. Despite Plaintiff having paid and behaving calmly and cooperatively, Talmon made a false 911 call stating that Plaintiff needed to be trespassed, claiming she was a non-paying customer who was refusing to leave. This report was knowingly false and made while Plaintiff was actively packing her belongings, with one trolley already outside and another half-filled by her door.

During the encounter, the Deputy — who was the only law enforcement officer present — asked Talmon, if she had ever done this to anyone else? Talmon replied, "Yes, lots of times."

**25.**

When he followed up, "Even when paid?" she confirmed that she had removed guests halfway through their stay despite having paid. This admission revealed a pattern of arbitrary and potentially unlawful evictions. Yet despite this acknowledgment, the deputy sided with the hotel, reinforcing the false narrative and enabling Plaintiff's removal.

Prior to the call, Talmon gave shifting and discriminatory reasons for eviction — first alleging that Plaintiff had written bad reviews (which she had not), and then stating it was because Plaintiff was from Hot Springs. These inconsistent justifications lacked any legal or contractual basis. Talmon's false report triggered a law enforcement response that resulted in Plaintiff being threatened with arrest, denied access to her property and pet, and left without shelter or transportation, at least until later.  Plaintiff finally got an SUV rental and stayed the night .

- **Key Allegations Against General Manager Haley Denise Talmon**

- Initiated Plaintiff's removal despite Plaintiff having paid for her stay

- Gave shifting and discriminatory reasons for eviction (bad reviews, being from Hot Springs)

- Made a false 911 call claiming Plaintiff was a non-paying customer refusing to leave

- Admitted to the deputy that she had removed other paying guests mid-stay

- Triggered law enforcement response based on knowingly false information

- Caused Plaintiff to be threatened with arrest and denied access to her property and pet

- Returned Plaintiff's purse silently after the deputy left, without apology or explanation

26.

- Unloaded Plaintiff's belongings and dropped boxes and clothes on dirt and grass at the edge of the property

- Acted with dishonesty, recklessness, and disregard for Plaintiff's dignity and rights

- Was the catalyst for the emotional and constitutional harm suffered by Plaintiff

- **Investigator Chase Matthews,**

Investigator Chance Matthews (Deputy Matthews at the time of the event) acted under color of law when he removed Plaintiff from the premises without legal justification, restricted her liberty, and refused to allow access to her property. Plaintiff, who was 72 years old at the time, calmly asked if she could go over to the nearby trolley to search for her missing purse. Matthews responded by threatening her with immediate arrest if she did so. This was not a one-time warning — Matthews repeated the threat many times, loudly and aggressively, in a public hallway where other guests and staff could hear. His voice was raised, and he sounded frustrated, as if he wanted the entire hotel to witness his threats. At one point, he stated, "I am trying very hard not to arrest you," despite Plaintiff's lawful conduct and composed demeanor.

Matthews also called his Supervisor during the incident to ask whether Plaintiff could be made to leave her belongings behind and then be removed from the premises. This call demonstrates that Matthews was aware of the legal and ethical concerns surrounding the seizure of Plaintiff's property, yet he proceeded anyway. After issuing repeated threats, Matthews said only one final thing to Plaintiff before

27.

leaving the area entirely—"Every five minutes you said, you were not leaving." Plaintiff responded calmly, saying, I do not recall ever having said that." As she looked at the body camera, she added, "Sheriff, I did not say that." Matthews offered no reply and left the area, apparently believing Plaintiff had no purse, since it remained missing.  He had said, he was done.

He made no effort to assist in locating it and left Plaintiff without access to her property, without shelter, and with no current transportation—unless she walked somewhere alone. She had nowhere to stay that night and no means to secure food, lodging, or safety. Any reasonable person, especially any woman, would recognize the anxiety, fear, and emotional distress caused by being abandoned in such a vulnerable state.

These actions—threatening arrest, denying access to property, misrepresenting Plaintiff's words, and abandoning her without support—collectively amounted to unlawful detention, intimidation, illegal seizure, and denial of due process. Matthews' coordination with hotel staff and refusal to allow access to Plaintiff's belongings—including her pet—further contributed to the emotional and constitutional injuries suffered by Plaintiff. His behavior reflects deliberate indifference to Plaintiff's civil liberties and a misuse of law enforcement power in a non-criminal, civil context.

Following the incident, Plaintiff sent a detailed email to the Garland County Sheriff describing the Deputy's conduct and expressing her belief that he should never be allowed to testify against anyone in any court, given his behavior of this event. Despite this, and without knowledge of the false 911 call that initiated the event, the Sheriff promoted Matthews. This decision reflects a failure of oversight and a troubling disregard for the seriousness of Plaintiff's allegations.

**28.**

- **Key Allegations Against Investigator Chance Matthews, (then deputy)**


- Referred to Plaintiff as "Parkerson, first name Jail" when calling dispatch

- Removed Plaintiff from the premises without legal justification

- Repeatedly threatened Plaintiff with arrest, loudly and publicly

- Gave veiled advice for her to leave town, because no one would let her stay.

- Denied access to Plaintiff's purse, property, pet, and other belongings

- Called his supervisor to ask about removing Plaintiff and leaving her belongings behind

- Misrepresented Plaintiff's words, falsely claiming she refused to leave

- Walked away without assisting Plaintiff, leaving her stranded

- Left Plaintiff, age 72, without shelter, transportation, or access to basic needs

- Suggested renting a U-Haul despite an adequate SUV already being arranged

- Caused emotional distress and fear through intimidation and abandonment

- Was promoted by the Sheriff despite Plaintiff's detailed complaint email

- Should not be permitted to testify in court due to credibility concerns

**29.**

- **Sheriff Mike McCormick – Garland County Sheriff's Office**

Garland County Sheriff Mike McCormick is ultimately responsible for the conduct and accountability of all personnel within his department. Following the October 25, 2024 incident, Plaintiff emailed Sheriff McCormick a detailed account of the events, including allegations of unlawful behavior by Deputy Chase Matthews. These included false imprisonment, trespass of chattels, defamation, false light, and denial of civil rights under **42 U.S.C. § 1983**. Despite receiving this information, Sheriff McCormick failed to investigate or take corrective action.

Instead, he promoted Deputy Matthews to Investigator, in Feb. 2025, a move that appeared retaliatory and dismissive of Plaintiff's complaint. This promotion, in the face of serious allegations, reflects a ratification of unconstitutional behavior and a deliberate indifference to civil rights violations. Sheriff McCormick's inaction and endorsement of the Deputy's conduct contributed directly to the harm suffered by Plaintiff.

<u>Sheriff McCormick's failure to respond to Plaintiff's complaint sent on December 11, 2024, coupled with the promotion of Deputy Chance Matthews in February, 2025, constitutes deliberate indifference and ratification of unconstitutional conduct. This failure contributed to the violation of Plaintiff's rights under the Fourth and Fourteenth Amendments.</u>

Key Allegations Against Sheriff Mike McCormick

- Responsible for oversight and accountability of Garland County deputies

- Received a detailed email from Plaintiff outlining misconduct by Deputy Chase Matthews on **Dec. 11, 2024**, with no reply, except promoting Matthews from Deputy to Investigator on **February 2025** approximately two months, later.

30.

- Failed to investigate or take corrective action

- Promoted Deputy Matthews despite serious allegations of unlawful conduct

- Ratified unconstitutional behavior and showed deliberate indifference to civil rights violations

- Contributed to Plaintiff's emotional distress, property deprivation, and denial of constitutional protections, as well as loss of property, **Count VII**.

- **Garland County**

Garland County, Arkansas is responsible for the training, supervision, and conduct of personnel within the Garland County Sheriff's Department, including Deputy Chase Matthews. The County failed to properly train or supervise its deputies in handling civil matters, respecting constitutional rights, and avoiding unlawful detention. It maintained or permitted policies that allowed for the misuse of law enforcement authority in private disputes, contributing to the abuse of process, false imprisonment, emotional distress, and civil rights violations suffered by Plaintiff.

Garland County is liable for the acts of its employees under the doctrines of ***respondeat superior*** and **municipal liability**. The Latin term *respondeat superior*, which translates as "let the master answer," refers to a legal doctrine in which an employer may be held responsible for the actions of his employees, when the actions are performed "in the course of employment." Garland County's failure to investigate Plaintiff's complaint, discipline the involved deputy, or implement corrective measures reflects a policy or custom of deliberate indifference to constitutional violations. This institutional failure directly contributed to the unlawful detention, deprivation of property, and emotional harm

**31.**

suffered by Plaintiff.

Defendant Garland County, of Arkansas is also liable under **Monell v. Department of Social Services, 436 U.S. 658 (1978)**, for policies, practices, or customs that caused or contributed to the violations of Plaintiff's constitutional rights.

The conduct of Deputy Chase Matthews, the lack of accountability following Plaintiff's email to Sheriff McCormick, and the subsequent promotion of Matthews reflect a policy or custom of deliberate indifference to citizens' complaints and constitutional violations.

Garland County's failure to investigate or discipline Matthews, despite clear notice, demonstrates a pattern of ratifying misconduct and failing to protect the rights of individuals, including Plaintiff.

**Key Allegations Against Garland County, Arkansas**

- Responsible for training, supervision, and conduct of Sheriff's Department personnel

- Failed to train deputies in handling civil matters and respecting constitutional rights

- Permitted misuse of law enforcement authority in private disputes

- Failed to investigate Plaintiff's complaint or discipline involved personnel

- Maintained policies or customs reflecting deliberate indifference to civil rights

- Liable under respondeat superior and municipal liability doctrines

- Contributed to abuse of process, false imprisonment, and emotional distress

- Directly responsible for Plaintiff's unlawful detention and harm

**32.**

- And it's not that hard to see why it happened, who did it, how the system allowed it, and what needs to change.

**John Does 1–25** to be determined through possible discovery.

## Defendant Liability Summary

The following outlines the specific actions and legal claims associated with each named Defendant:

**Defendant Talmon (General Manager, Staybridge Suites on October 25, 2024)**

**Count I**: Abuse of Process – Initiated a false 911 call to remove Plaintiff without legal eviction.

**Count II**:  Breach of Contract.  Breached the paid-in-full reservation of Plaintiff's.

**Count III**: Defamation – Falsely reported Plaintiff as a trespasser to law enforcement.

**Count IV**: Negligence – Failed to verify Plaintiff's reservation before calling police.

**Count V**: Intentional Infliction of Emotional Distress – Created a false emergency and triggered Plaintiff's removal.

**Count VII**: Trespass to Chattels – Interfered with Plaintiff's property during the removal.

**Count VIII**: False Light – Portrayed Plaintiff as a criminal trespasser to law enforcement.

**33.**

**Count IX**: **Civil Rights Violation (42 U.S.C. § 1983)** – Acted jointly with law enforcement, directing Plaintiff's movement and participating in state action.


**Defendant Investigator Chance Matthews (Garland County Sheriff's Office)**

**Count I**: Abuse of Process – Used police authority to enforce a civil matter without legal basis.

**Count III**: Defamation – Reinforced false claims about Plaintiff's status during removal.

**Count IV**: Negligence – Failed to investigate or verify Plaintiff's legal right to remain.

**Count V**: Intentional Infliction of Emotional Distress – Removed Plaintiff under false pretenses, causing emotional harm.

**Count VI**: False Imprisonment – Directed Plaintiff's physical movement and compelled her departure without legal authority.

**Count VII**: Trespass to Chattels – Interfered with Plaintiff's personal property during removal.

**Count VIII**: False Light – Reinforced false portrayal of Plaintiff as a trespasser.

**Count IX**: **Civil Rights Violation 42 U.S.C. § 1983** – Acted under color of law to deprive Plaintiff of liberty and property without due process.

**34.**

**Garland County, Arkansas**

**Count IV**: Negligence – Failed to train and supervise Deputy Matthews.

**Count VI**: False Imprisonment – Liable through agency for unlawful detention of Plaintiff.

**Count IX: Civil Rights Violation (42 U.S.C. § 1983)** – Maintained policies or customs that led to constitutional violations.

**Garland County Sheriff Mike McCormick**

Count IV: Negligence – Failed to act on Plaintiff's complaint and supervise subordinates.

Count V: Intentional Infliction of Emotional Distress – Ignored credible allegations of misconduct, and instead, condoned bad behavior of his deputy with a promotion.

Count VI: False Imprisonment – Ratified unlawful conduct by promoting Deputy Matthews.

Count IX: **Civil Rights Violation 42 U.S.C. § 1983** – Personally participated in or ratified the deprivation of Plaintiff's rights.

**Staybridge Suites Hot Springs (Corporate Entity)**

Count II: Breach of Contract – Violated Plaintiff's valid reservation agreement by removing her prematurely.

Count IV: Negligence – Failed to supervise staff and protect guest rights.

Count V: Intentional Infliction of Emotional Distress – Created a false emergency through its General

**35.**

Manager.

Count VII: Trespass to Chattels – Staff interfered with Plaintiff's personal property.

Count IX: Civil Rights Violation (42 U.S.C. § 1983) – Acted jointly with law enforcement, including controlling Plaintiff's movement and access to basic needs.

**IHG Management (Maryland) LLC**

Count II: Breach of Contract – As parent company, may be liable for reservation enforcement and guest protections.

**Count IV**: Negligence – Failed to train or supervise hotel staff.

**Count V**: Intentional Infliction of Emotional Distress – May have ratified or ignored Talmon's conduct.

**Count IX**: Civil Rights Violation (42 U.S.C. § 1983) – Participated in or failed to prevent state action through its employee.

**36.**

## LEGAL STANDARDS

Plaintiff asserts claims under both Federal and Arkansas law. These include constitutional violations under **42 U.S.C. § 1983** and common law torts such as defamation, false imprisonment, and emotional distress. The applicable legal standards include the **Fourth and Fourteenth Amendments to the U.S. Constitution**, as well as Arkansas doctrines governing abuse of process, breach of contract, negligence, and related claims.

Each cause of action asserted in this Complaint is governed by established legal principles, which will be set forth in detail within the Causes of Action section below.

Plaintiff's federal claims are grounded in the following constitutional protections:

**Fourth Amendment**: Protects against unreasonable seizures of persons and property. Violations occur when law enforcement detains, removes, or searches individuals without legal justification, probable cause, or a warrant.

**Fourteenth Amendment**: Guarantees due process before the deprivation of liberty or property. Violations occur when individuals are denied notice, a fair hearing, or equal protection under the law.

These protections are enforceable under **42 U.S.C. § 1983**, which provides a cause of action against individuals acting under color of state law. Liability may extend to municipalities under ***Monell v. Department of Social Services, 436 U.S. 658 (1978),*** when the violation results from an official policy, widespread custom, or failure to train or supervise personnel. Supervisory liability arises when a supervisor personally directs, authorizes, or knowingly fails to prevent unconstitutional conduct.

**37.**

## CAUSES OF ACTION

### COUNT I – ABUSE OF PROCESS

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in Paragraphs **1, 2, 10, & 18** of Plaintiff's Factual Allegations, Defendant Talmon engaged in abuse of process by initiating a legitimate legal mechanism—calling 911—for a malicious and improper purpose. **Exhibits A, B, C, F, G, & I** support this claim.

**1. Legal Basis**

This cause of action arises under Arkansas common law for Abuse of Process and is supported by statutory authority under *Arkansas Code § 12-10-315*, which prohibits knowingly making false reports to emergency services.

**2. Factual Allegations**

On October 25, 2024, at approximately 3:00 PM, Defendant Talmon, General Manager of Staybridge Suites Hot Springs, initiated a 911 call requesting law enforcement intervention. Defendant falsely claimed Plaintiff was not a paying guest, despite Plaintiff having paid in full for an extended reservation (**Exhibit G**), nor was Plaintiff refusing to leave. In fact, Plaintiff had already filled the first luggage trolley and placed it out front of the hotel before Defendant Talmon made the 911 call, demonstrating her intent to comply and vacate the premises peacefully. The call was made with

**38.**

malicious intent—not to resolve a legitimate emergency, but to intimidate, humiliate, and forcibly remove Plaintiff from the premises.

Once dispatched, law enforcement did not act neutrally. As described in Plaintiff's Statement of Facts, the deputy's conduct reflected bias and alignment with the hotel's narrative. He supplied answers to the General Manager before she responded, but did not extend the same courtesy to Plaintiff. This disparity shows the deputy was not merely passive — he was actively shaping the story to support the hotel's position, which constitutes a misuse of legal authority and a denial of fair treatment.

Plaintiff's long-haired cat, **Kitty Lee**, cried continuously from inside her carrier while the deputy and General Manager were in the room. Plaintiff asked the deputy if her cat could be let out, but the deputy said No. Though, at one point, the deputy appeared to recognize the wrongness of what was being done to Plaintiff, he soon changed his demeanor — becoming curt, dismissive, and ridiculing Plaintiff's circumstances. He made comments that insinuated Plaintiff should leave town, though not in those exact words, and remarked that it wasn't illegal to be homeless or a non-resident. These statements, combined with his refusal to allow humane treatment of Kitty Lee, reflect a misuse of legal authority to intimidate and emotionally harm Plaintiff.

**3. Elements of Abuse of Process**

Plaintiff alleges that Defendant Talmon's conduct satisfies the elements of abuse of process under Arkansas law:

- **Improper Use of Legal Process**: The 911 system was used to achieve a private, retaliatory goal rather than to address an actual emergency.

- **Ulterior Motive**: Defendant ignored reasonable alternatives, such as allowing Plaintiff to complete her paid stay, and acted with intent to cause emotional harm.

**39.**

- **Foreseeable Harm**: Defendant knew Plaintiff was 72 years old and had medical issues, making removal especially harmful.

- **Pattern of Misuse**: Defendant has a history of using 911 calls to remove guests from the premises, as stated in her own words (**Exhibit I**), reflecting a pattern of retaliatory and profit-driven behavior.

### 4. Statutory Violation

Defendant's actions also violated **Arkansas Code § 12-10-315**, which states:

> "Any person calling the number 911 for the purpose of making a false alarm or complaint and reporting false information which could result in the emergency dispatch of any public safety or private safety agency… shall be guilty of a Class A misdemeanor." Defendant's false statements directly resulted in the dispatch of law enforcement and Plaintiff's removal, constituting a misuse of emergency services under this statute.

### 5. Damages

As a direct and proximate result of Defendant's abuse of process, Plaintiff suffered:

- Public humiliation, including being paraded in front of others during removal

- Emotional distress

- Loss of lodging and financial harm

- Exposure to physical danger, including being forced to sleep in a loaded SUV in a roadside parking lot with her cat

**40.**

- Deprivation of liberty and access to personal property

Plaintiff seeks compensatory and punitive damages under Arkansas law. Punitive damages are warranted due to the intentional and malicious nature of Defendant's misconduct, including a documented pattern of misusing emergency services to remove guests.

## COUNT II– BREACH OF CONTRACT

Plaintiff repeats and re-alleges paragraphs **1–37** above as if fully set forth herein.

As described in **Paragraphs 1–2 & 6–7** of Plaintiff's Factual Allegations, Defendant Talmon failed to honor Plaintiff's prepaid reservation and had her forcibly removed from the premises. This conduct constitutes a material breach of contract under Arkansas law.

**1. Valid Contract** Plaintiff entered into a valid contract for lodging at Staybridge Suites Hot Springs, evidenced by two guaranteed, prepaid reservations—both through Priceline. These reservations were confirmed in advance and paid in full, satisfying the elements of mutual intent, acceptance, and agreement. (**Exhibits A & B**)

**2. Plaintiff's Performance** Plaintiff fulfilled her contractual obligations by paying in full for the second week's reservation at the time of booking. She received a confirmation email days prior to check-in and arrived on time to occupy the reserved room.

**41.**

**3. Breach by Defendant** Defendant Talmon breached the contract by refusing to honor Plaintiff's guaranteed reservation and forcibly removing her from the premises. No alternative accommodations were offered, despite the hotel's obligation to do so under industry standards and consumer protection guidelines.

According to FindLaw's "Hotel Guest Legal Rights: FAQ," a prepaid reservation is guaranteed. If a hotel cannot provide the room, it must offer a reasonable substitute and cover transportation costs. Defendant Talmon failed to offer any substitute lodging or assistance, thereby violating both contractual and consumer obligations.

**4. Resulting Damages** As a direct and proximate result of Defendant's breach, Plaintiff suffered:

- Loss of lodging for the reserved week

- Financial harm, including the cost of re-renting a vehicle after returning the first SUV that morning

- Physical exhaustion from unloading and reloading her belongings

- Emotional distress caused by the deputy's repeated threats of arrest, including when Plaintiff asked to search for her missing purse

- Humiliation and fear during the forced removal, despite Plaintiff's continued compliance and visible fatigue

Defendant Talmon's failure to honor the reservation and provide reasonable alternatives constitutes a material breach of contract. Plaintiff seeks compensatory damages for financial loss, emotional harm, and physical hardship resulting from this breach.

**42.**

## COUNT III – DEFAMATION

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in **Paragraphs 10 & 34** of Plaintiff's Factual Allegations, Defendant Talmon knowingly made false statements during a 911 call, alleging that Plaintiff was a non-paying customer who was refusing to leave the premises. These statements were made with the intent to initiate law enforcement involvement and resulted in Plaintiff's removal. The 911 dispatcher relied on Defendant's statements, which were later disseminated to responding officers, hotel guests, and the public through FOIA records and court documents.

### 1. Legal Basis

This cause of action arises under Arkansas common law for defamation. Defendant's statements were false, published to third parties, made with knowledge or reckless disregard of their falsity, and caused Plaintiff reputational and emotional harm.

### 2. Elements of Defamation

Plaintiff alleges that Defendant Talmon's conduct satisfies the elements of defamation under Arkansas law:

- **False Statement**: Defendant stated that Plaintiff was a "non-paying customer" who was refusing to leave, despite Plaintiff having a valid, paid-in-full reservation and packing her

**43.**

- belongings to load the coming SUV.

- **Publication**: These statements were communicated to the 911 dispatcher, responding law enforcement officers, hotel guests present in the lobby, and the public via FOIA records and court filings.

- **Falsity**: Plaintiff had a confirmed reservation, paid in full days earlier, and had not refused to leave. She was waiting for her second vehicle to arrive so she could pack and depart. (**Exhibits A, B, & I**)

- **Fault**: Defendant acted with knowledge of the falsity or reckless disregard for the truth. She ignored the deputy's suggestion for a peaceful resolution and may have been motivated by financial gain, as Plaintiff observed new guests arriving shortly after her removal. (**Exhibit I**)

- **Damages**: Plaintiff suffered public humiliation, reputational harm, and emotional distress. The incident was captured on body cam video and audio recordings, which are publicly accessible. Plaintiff was forced to spend the night in a rented SUV in a roadside parking lot with her cat. She felt powerless and criminalized despite having done nothing wrong. As a member of the IHG hotel group, Plaintiff was treated not only unfairly, but as if she were a criminal being pushed out of town. (**Exhibit I**)

## 3. Relief Requested

Plaintiff seeks compensatory and punitive damages for defamation under Arkansas law. Defendant's conduct was intentional, malicious, and caused lasting harm to Plaintiff's reputation and emotional well-being.

**44.**

## COUNT IV - NEGLIGENCE

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in **Paragraphs 1–10** of Plaintiff's Factual Allegations, Plaintiff kept the hotel front desk informed of her plans to return the rented SUV, store her belongings in the hotel's locked closet, and remain for the duration of her two-week reservation. She had purchased groceries for the week ahead and made clear her intent to stay.

**1. Duty of Care** Defendant Talmon, as General Manager of Staybridge Suites Hot Springs and representative of IHG, owed Plaintiff a duty of reasonable care. Plaintiff was a paying guest with a confirmed reservation and a member of the IHG hotel group. Defendant had a professional obligation to ensure Plaintiff's stay was honored and handled with dignity, particularly given Plaintiff's age and medical condition.

**2. Breach of Duty** As outlined in **Paragraphs 1–2** of Plaintiff's Factual Allegations, Defendant breached this duty by canceling Plaintiff's paid-in-full reservation without cause and initiating a 911 call containing false and misleading information. This resulted in Plaintiff being publicly removed from the property by law enforcement, despite the deputy acknowledging that Plaintiff had committed no crime and paid for the next week.

**Causation** As seen in **Paragraph 10** of Plaintiff's Factual Allegations, Defendant Talmon's actions were the direct and proximate cause of Plaintiff's emotional injury. The abrupt removal, public spectacle, and dismissive treatment by law enforcement stripped Plaintiff of her dignity and sense of

**45.**

control. She was left standing outside the hotel, observed by familiar faces, and emotionally devastated by the experience.

**4. Damages** Plaintiff continues to suffer emotional trauma, anxiety, and hyper-vigilance. Loud noises now trigger fear. Her cat, always calm, now cries in the night—mirroring Plaintiff's unrest. The ordeal left Plaintiff feeling powerless, as though her future could be dictated by others without recourse. Even basic requests, such as asking to use the bathroom, became moments of desperation and humiliation to her.

A reasonable person in Defendant Talmon's position would have foreseen that such actions—false reporting and unjustified removal—could cause serious harm. Defendant's conduct was reckless, unjustified, and devoid of compassion.

**5. Relief Requested** As a direct and proximate result of Defendant's negligence, Plaintiff suffered emotional distress, financial hardship, and interference with personal property. Plaintiff is entitled to compensatory damages under Arkansas law.

**46.**

## COUNT V – INTENTIONAL INF

## INTENTIONAL INFLICTION OF EMOTIONAL  DISTRESS

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in **Paragraphs 6–10, 16–17, & 23–29** of Plaintiff's Factual Allegations, Defendant Talmon's conduct demonstrated a reckless disregard for Plaintiff's emotional well-being and resulted in severe emotional distress.

### 1. Defendant's Conduct

Defendant Talmon, acting as General Manager of Staybridge Suites Hot Springs, engaged in extreme and outrageous conduct by knowingly making a false 911 report and orchestrating Plaintiff's public removal from the hotel. This occurred despite Plaintiff's paid-in-full reservation and peaceful presence. Defendant's actions were not merely negligent—they were calculated to humiliate, intimidate, and degrade.

### 2. Intent or Reckless Disregard

Defendant either intended to cause emotional harm or acted with reckless disregard for the likelihood that her conduct would inflict severe emotional distress. The decision to involve law enforcement under false pretenses, cancel Plaintiff's reservation without cause, and deny her basic dignity reflects a willful disregard for Plaintiff's well-being.

**47.**

### 3. Resulting Emotional Distress

Plaintiff, a 72-year-old woman, was subjected to public humiliation, verbal dismissal, and physical displacement. She was marched through the hotel in front of other guests, treated as though she had committed a crime, and forced to ask permission to use the bathroom in her own room. Although the Deputy confirmed Plaintiff had done nothing wrong, the emotional damage was already inflicted.

Since the incident, Plaintiff has experienced ongoing emotional trauma, including anxiety, hyper-vigilance, and a profound loss of trust. Loud noises now trigger fear. Her cat, now extremely dependent on her being near—mirroring Plaintiff's own unrest. The experience left her feeling powerless, disillusioned, and deeply wounded.

### 4. Legal Standard

Defendant Talmon's conduct was so extreme and outrageous as to exceed all bounds of decency in a civilized society. A reasonable person would recognize that such actions—false accusations, public humiliation, and disregard for a vulnerable guest—would likely cause severe emotional harm, especially when having to stay overnight in a parking lot.

### 5. Relief Requested

Plaintiff seeks compensatory and punitive damages for the emotional injuries sustained as a direct result of Defendant's intentional and reckless conduct.

**48.**

## COUNT VI –

## FALSE IMPRISONMENT

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in Paragraphs **12–13, 16–18, 20–21, 24, 26, 28, & 31** of Plaintiff's Factual Allegations, Plaintiff was confined without legal authority and against her will through the coordinated actions of Defendant Talmon and law enforcement as Deputy Matthews.

### 1. Unlawful Restraint

Plaintiff was subjected to substantial interference with her liberty without lawful authority or consent. Despite holding a valid, paid-in-full reservation, Plaintiff was threatened with arrest and forcibly escorted off the property. The deputy involved admitted on body camera that Plaintiff had done nothing wrong—criminally or otherwise—yet proceeded to restrict her movements and control her actions.

While escorting Plaintiff through the hotel, the Deputy called his superior to ask whether Plaintiff could be trespassed and deny the taking of her belongings. This occurred in Plaintiff's presence, as she was being directed through the lobby to the elevator. The call demonstrates active coordination between law enforcement and hotel management to restrict Plaintiff's liberty and access to property, despite the Deputy's own admission that Plaintiff had done nothing wrong.

Plaintiff was told she could not retrieve her belongings, when she asked if she could go look for her missing purse, on the trolley with her other belongings. The Deputy directed her where to go, when to

**49.**

move, and where to stand, effectively tying her hands and keeping her confined until she complied.

### 2. Knowledge of Confinement

Plaintiff was fully aware of the restraint and suffered harm as a result. Her cat was held separately and returned only after prolonged distress, soiled in her carrier due to the Deputy's instruction not to let her out. Plaintiff's purse went missing during the incident, further compounding her sense of helplessness.

### 3. Public Humiliation and Emotional Harm

Plaintiff was paraded through the hotel—hallways, elevator, lobby, and outside—while guests looked on. This spectacle created the impression that Plaintiff had committed a serious offense, despite the Deputy's own admission that she had not. The public display added to Plaintiff's humiliation and emotional trauma.

### 4. Impact on Plaintiff and Her Pet

Plaintiff's cat, Kitty Lee, continues to show signs of stress and anxiety, crying at night and unable to sleep peacefully. Her cat also displays breathing problems, in having to open her mouth to breath, though she did not, before this event.  Her hair was long and straight, and she loved being brushed. After the event much of her hair knotted and she cries, when brushed, like it hurts her skin.  She cries from a low pitch up to a much higher pitch, like she is howling in the daytime.  And at night she has to be comforted, when, she abruptly awakens by her own crying. Plaintiff herself remains emotionally shaken, sleep-deprived, and haunted by the loss of control and dignity she experienced. The unlawful restraint and separation from her pet and belongings caused lasting harm.  And neither deserved having to go through this bad experience.

**50.**

### 5. Legal Basis

False imprisonment occurs when a person is confined without legal authority and against their will. Defendant's actions—through coordination with law enforcement—resulted in Plaintiff's confinement, humiliation, and emotional injury. The deputy admitted on camera that Plaintiff had done nothing wrong and had paid for her stay in full. Nonetheless, Plaintiff was directed, controlled, and confined until she complied with removal. She was told to "stay there" at the edge of the property and threatened with arrest if she attempted to retrieve her belongings, including her purse.

The deputy's inquiry to his superior about denying Plaintiff access to her property—despite no legal basis for such denial—further supports the claim of false imprisonment. Plaintiff was effectively confined and coerced into compliance under a series of many threats of arrest, while being separated from her possessions and pet.

  False Imprisonment; being unlawfully restrained or confined, with lack of consent and legal justification.

### 6. Relief Requested

Plaintiff seeks compensatory and punitive damages under Arkansas law for the unlawful restraint, emotional trauma, and reputational harm caused by Defendant's conduct.

False Imprisonment; being unlawfully restrained or confined, with lack of consent and legal justification.

51.

## COUNT VII – TRESPASS TO CHATTELS

**Plaintiff repeats and re-alleges Paragraphs 1–37 above as if fully set forth herein.**

As described in **Paragraphs 13, 14, 20, 21, & 23** of Plaintiff's Factual Allegations, Plaintiff's personal property was intentionally interfered with by Defendant Talmon and a deputy of the Garland County Sheriff's Department, resulting in deprivation of use and emotional harm.

**1. Intentional Interference** Plaintiff's purse, pet, and other personal belongings were wrongfully withheld during her unlawful removal from the property. Despite Plaintiff's repeated requests, she was denied access to her purse and threatened with arrest, if she attempted to go look for it. Her personal property was intentionally interfered with when, Deputy Matthews left the scene abruptly, leaving Plaintiff without access to her purse, phone, money or belongings. The hotel's General Manager later returned Plaintiff's purse without comment, but also set/dumped her remaining belongings on the dirt and grass at the edge of the property. This act of placing Plaintiff's possessions outside in a vulnerable and degrading manner — without her consent and while she was under threats of arrest — constitutes intentional interference with her possessory interest. The resulting loss of access and emotional distress support a plausible claim for trespass to chattels. **16-12-38**, Deputy said I had to leave even without my purse.

**2. Lack of Consent and Justification** Plaintiff had a valid, paid-in-full reservation and had committed no crime. The withholding of her property was neither authorized by law nor justified by any legitimate business or legal interest.

**52**.

**3. Actual Harm** Plaintiff suffered emotional distress, loss of access to essential items (including identification and money), and disruption of travel plans. The interference with her property was substantial and caused real, measurable harm.

**4. Exhibits Supporting Claim Exhibits A, B, C, H, & I** document the unlawful removal, denial of access to property, and threats of arrest.

**5. Relief Requested** Plaintiff seeks compensatory damages for the loss of use and emotional harm resulting from the interference with her personal property, and punitive damages for the intentional and unjustified conduct of Defendant Talmon and the deputy.

Plaintiff alleges that her personal property was intentionally interfered with during the course of her removal from the hotel. At first, Defendant Talmon locked Plaintiff out from being able to retrieve her belongings from the hotel's storage closet.  Defendant purposely locked her out, even though she knew Plaintiff was attempting to leave there. Meanwhile, Deputy Matthews left the scene abruptly, leaving Plaintiff without access to her purse, phone, money or belongings. The hotel's General Manager later returned Plaintiff's purse without comment, but also set/dumped her remaining belongings on the dirt and grass at the edge of the property. This act of placing Plaintiff's possessions outside in a vulnerable and degrading manner — without her consent and while she was under threat of arrest — constitutes intentional interference with her possessory interest. The resulting loss of access, exposure to the elements, and emotional distress support a plausible claim for trespass to chattels.

53.

## COUNT VIII– FALSE LIGHT INVASION OF PRIVACY

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

As described in Paragraphs **10–34** of Plaintiff's Factual Allegations, and supported by **Exhibits A, B, C, H, I, & J,** Defendant Talmon's conduct placed Plaintiff in a false light before the public, resulting in reputational harm and emotional distress for Plaintiff in her own hometown, when Defendant made that false 911 call and spoke of Plaintiff, and orchestrated a disgraceful display of lining the staff up, including a child, to watch her.

### 1. Legal Basis

Under Arkansas law, False Light Invasion of Privacy is recognized as a tort requiring proof of five elements, as outlined in **Arkansas Model Jury Instructions – Civil AMI 423.** The fifth element— knowledge or reckless disregard of falsity—must be proven by clear and convincing evidence.

### 2. Elements of False Light

Plaintiff alleges that Defendant Talmon's conduct satisfies all five elements:

- **Publicity Placing Plaintiff in a False Light**: Defendant made a false 911 call stating that Plaintiff was a non-paying customer refusing to leave the hotel. This information was shared with law enforcement and became publicly accessible through FOIA records, court documents, and body cam footage, placing Plaintiff in a false light as a trespasser and criminal.

- **Highly Offensive to a Reasonable Person**: Being falsely accused of criminal behavior— especially in one's hometown—would seriously offend or aggrieve a reasonable person. **Exhibit H;** Plaintiff's email to the Sheriff, reflects the emotional impact and public

54.

- embarrassment caused by the incident.

- **Causation**: Defendant's false report directly led to law enforcement removing Plaintiff from the hotel. The resulting humiliation, reputational damage, and emotional trauma were a proximate result of Defendant's conduct.

- **Knowledge or Reckless Disregard of Falsity**: Defendant knew Plaintiff had a valid, paid-in-full reservation and was peacefully present. Nonetheless, she made false statements to law enforcement. **Exhibits A, B, & C** provide clear and convincing evidence of Defendant's knowledge or reckless disregard for the truth.

- **Damages**: Plaintiff suffered emotional distress, reputational harm, and financial loss, including missed lodging and travel disruption. The incident caused lasting emotional trauma and public embarrassment in Plaintiff's hometown.

## 3. Relief Requested

Plaintiff seeks compensatory and punitive damages under Arkansas law for the emotional and reputational harm caused by Defendant's false and offensive portrayal of Plaintiff to the public.

Plaintiff's claim is about being **misrepresented, so False Light** fits. Defendant Talmon portrayed Plaintiff publicly in a misleading, offensive way, such as a non-paying customer refusing to leave, when trespassing. Public disclosure which distorted the truth.

**55.**

**COUNT IX – CIVIL RIGHTS VIOLATION (42 U.S.C. § 1983)**

Plaintiff repeats and re-alleges **Paragraphs 1–37** above as if fully set forth herein.

**1. Under Color of Law**

As described in **Paragraphs 11–14, 18, 20–22, & 28** of Plaintiff's Factual Allegations, Plaintiff was deprived of her constitutional rights through the actions of Deputy Chance Matthews of the Garland County Sheriff's Department, acting under color of law. Despite acknowledging that Plaintiff had committed no crime and held a valid, paid-in-full reservation (**see Exhibits A & B**), the Deputy enforced an unlawful eviction and restricted Plaintiff's liberty without legal justification.

**2. Unlawful Seizure and Denial of Property Access (Fourth Amendment)**

Plaintiff was forcibly removed from the premises and her movements were restricted without probable cause. The deputy directed Plaintiff through the hallway, elevator, and lobby in full view of hotel staff and guests, creating the appearance of criminal wrongdoing and subjecting her to public humiliation. During this process, Plaintiff was denied access to her personal belongings—including her purse and companion animal—and was threatened with arrest, if she attempted to retrieve them. Although the Deputy ultimately left the scene, Plaintiff remained without her belongings. Plaintiff believes the hotel's general manager had possession of her purse and only returned it after the Deputy departed, placing or dumping Plaintiff's items in a dirty grass area at the edge of the front of the property (**Exhibits I & J**). This treatment further emphasized the degrading and dismissive nature of the encounter. **15:57:46 Deputy stated to Plaintiff; If you do not leave, you are going to jail, even if you have to leave your property, here.**

56.

### 3. Violation of Due Process (Fourteenth Amendment)

Plaintiff was denied procedural protections despite her lawful status as a paying guest. She was removed from the property without notice, hearing, or any opportunity to contest the eviction. The deputy's actions were arbitrary and lacked any legal basis, constituting a violation of Plaintiff's right to liberty and property under the <u>Fourteenth Amendment</u>. **15:37:35 Plaintiff showed deputy paid-in-full on her cell phone.**

### 4. Discriminatory and Degrading Treatment

Plaintiff, a 72-year-old woman with known medical vulnerabilities, was treated in a humiliating and degrading manner. The Deputy paraded her through the public areas of the hotel as though she were a criminal, despite his own admission that she had done nothing wrong. This conduct demonstrated a reckless disregard for Plaintiff's dignity, safety, and emotional well-being.

### 5. Abuse of Authority

The deputy, despite recognizing Plaintiff's innocence, proceeded to remove her from the property, direct her movements, and separate her from her belongings—including her cat. Plaintiff was left on the side of the road across from the hotel without her purse, shelter, or support. The Deputy then departed, leaving Plaintiff in a vulnerable and unsafe condition. Plaintiff documented the incident in an email to Garland County Sheriff Mike McCormick, which included notes about the Deputy's conduct. **Exhibit H**

### 6. Resulting Harm

Plaintiff suffered emotional trauma, loss of dignity, and ongoing psychological distress. That night, without shelter, she was forced to sleep in a rental SUV parked in an empty lot. **Exhibits D & E.**

57.

The temperature reached 86°F that day, compounding the physical discomfort and emotional toll. Her fear of further retaliation by law enforcement was acute and persistent. Plaintiff's companion animal, Kitty Lee, was present throughout the ordeal. Despite Plaintiff's requests, the deputy refused to allow Kitty Lee out of her carrier see **Exhibit F**, further asserting control over Plaintiff's movements and personal property. This unnecessary restriction added to the emotional distress and sense of powerlessness Plaintiff experienced during the unlawful removal. Plaintiff continues to suffer from anxiety, sleep disruption, and a lasting sense of vulnerability. These damages are ongoing and directly traceable to the misconduct of those involved. **15:43:32** While still in her room, Plaintiff asked if she could go to the bathroom, and the deputy asked the General Manager of the hotel, if it was okay?

## 7. Relief Requested

Plaintiff seeks compensatory and punitive damages under **42 U.S.C. § 1983** against Deputy Chance Matthews for the deprivation of her constitutional rights and the emotional and physical harm suffered as a result. Plaintiff also seeks declaratory relief recognizing the violation of her rights and any further relief the Court deems just and proper.

**58.**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against

**DEFENDANTS; STAYBRIDGE SUITES HOT SPRINGS, d.b.a. HS STAYBRIDGE HOTEL LLC,**

**IHG MANAGEMENT (MARYLAND) LLC;**

**HALEY DENISE TALMON,** individually and in her official capacity as General Manager of Staybridge Suites Hot Springs, d.b.a. HS Staybridge Hotel LLC;

**GARLAND COUNTY;**

**GARLAND COUNTY SHERIFF, MIKE MCCORMICK,** Individual and in his Official capacity;

**INVESTIGATOR CHASE MATTHEWS,** (deputy during time of event 10/25/2024) **Individual and in his official capacity; and**

**JOHN DOES 1–25, which may be named after the discovery process.**

And award the Plaintiff the following relief:

### 1. Compensatory Damages

For the harms suffered across all nine counts, including but not limited to:

- **Contractual Damages** (Count II – Breach of Contract):

  Estimated range: $5,000.00 to cover lost lodging, travel disruption, and reservation-relate expenses.

**59.**

- **Procedural Abuse Damages** (Count I – Abuse of Process):

  Estimated range: $5 million for emotional harm and misuse of legal process, especially, when she could have been criminally charged for making the false 911 Call and doing it many times.

- **Reputational Damages** (Counts III & VIII – Defamation and False Light):

  Estimated range: $5 million for public humiliation, reputational injury, and community impact.

- **Emotional Distress Damages** (Counts IV & V – Negligence and IIED):

- $25 million for the humiliation caused to Plaintiff in the demeaning way, they spoke to her, as well as the loss of her cat, as it acted like it was Plaintiff, who had done all to her, the

- parading in the lobby and other hotel areas, where other guests could hear it all with the\ Deputy's loud voice.

- **Loss of Liberty and Dignity** (Count VI – False Imprisonment):

  Estimated range: $5 million for unlawful restraint and public degradation, which they had no right to do, when she had not done anything wrong, as he, himself, was on tape saying that fact.

**60.**

- **Property and Pet-Related Damages (Count VII** – Trespass to Chattels

  Estimated range: $5 million for interference with personal belongings and harm to Plaintiff's

  pet.  One item stolen from Plaintiff was a Vita Master which could make homemade soup, a

  dear friend had given her, before he died.  It had not been taken out of the box, at that time.  It

  was on the same trolley, that Defendant Talman pushed, that had had Plaiintiff's missing purse

  on it.

- **False Light Invasion of Privacy (Counts III & VIII** –Defamation and False Light

  Estimated range:[$2.5million] for public humiliation, reputational injury, and

  community impact.

- **Civil Rights Violations (Count IX – 42 U.S.C. § 1983):**

  Estimated range: $[25 million] for deprivation of constitutional rights and misuse of state

  power.

## 1. Punitive Damages

In an amount sufficient to punish Defendant's intentional, malicious, and reckless conduct and to deter

similar future misconduct.

## 2. Nominal Damages

Where applicable, to affirm the violation of Plaintiff's rights even in the absence of substantial

financial loss.

**3. Costs and Fees**

Including reasonable attorney's fees (if applicable), court costs, and any other expenses incurred in pursuing this action.

**4. Any Other Relief**

That Plaintiff Parkerson be given a paid-in-full week's reservation, with the dates of her choice, for Staybridge Suites Hot Springs, so that she can attend the week's socials, and hopefully get to speak with the individuals, she had met at her last stay, to get to explain to them, that she was not a criminal and take Court papers to prove it. And if it bothers the hotel owners, well, that's okay. She wants to see the neighbors in that area, who were out for their afternoon walks, on that October 25, 2024 event, to tell them what happened to her, and to show them those same papers. And all else the Court deems just and proper under the circumstances, including injunctive or declaratory relief as warranted.

LEAST YOU FORGET. A MINIMUM OF $25 MILLION FOR PUNTIVE DAMAGES AND ASK THE COURT TO FIGURE ALL OF THE REST OF THE AMOUNTS FOR ALL COUNTS.

Plaintiff demands a trial by jury on all issues so triable.

**61.**

## Exhibits List

**Exhibit A – Reservation Confirmation Oct. 18, 2024 through October 25, 2024**

Supports **Count II** - Breach of Contract.

**Exhibit B – Reservation Confirmation Oct. 25, 2024 through November 1, 2024**

Supports **Count II** - Breach of Contract.

**Exhibit C – 911 Record of Call** Supports **Count I** - Abuse of Process & **Count III** -

Defamation from Plaintiff's FOIA request.

**Exhibit D – Enterprise Confirmation for SUV rental** ending **October 25, 2024**.

**Exhibit E - Enterprise Confirmation for SUV rental** beginning **October 25, 2024**.

**Exhibit F – Picture of Kitty Lee**. Supports <u>Trespass to Chattels **VII**, supports</u>

<u>Intentional Infliction of Emotional Distress</u> (IIED) Tort of Outrage **Count V**

**Exhibit G – Signed Pet Fee, $75**. Plaintiff paid-in-full. **<u>Count IV – Negligence & VI.</u>**

**Exhibit H – Email from Plaintiff Parkerson to Garland County Sheriff Mike**

**McCormick** regarding event at hotel with Deputy Chase Matthews notes

included.   **Counts I, II, III, IV, V, VI, VII, VIII, & IX**

**Exhibit I –** Pictures taken by Plaintiff Parkerson of front of hotel, GM, and Plaintiff's

boxes/items, and hanging clothes. **Count V & Count VII**

**Exhibit J – Outside pictures of where defendant relocated the items** including

**62.**

clothes. **Count V & Count VII.** Her items were stolen from the trolley.

**Exhibit K- Defendant Talmon's business card,** she handed to Plaintiff.

**Exhibit L** – GM Defendant Talmon's call at 11:44 AM on 10/25/2024 to Plaintiffs cell phone number.

**Exhibit M** – Body Cam Video.

## DEFENDANTS' CONDUCT AS RELATED TO THE COUNTS

1. **Staybridge Suites Hot Springs** Through its employees and policies, Staybridge Suites initiated Plaintiff's removal from the premises and denied her access to her belongings. The hotel's conduct, including the decision to trespass Plaintiff and involve law enforcement without valid cause, contributed directly to the violation of Plaintiff's First, Fourth, and Fourteenth Amendment rights.

   **Count I** – **Abuse of Process**: Initiating removal and involving law enforcement

**63.**

- without valid cause.

**Count II – Breach of Contract**: Denying access to belongings and lodging

services.

**Count V – Intentional Infliction of Emotional Distress**: Dumping belongings

outside, causing humiliation.

**Count VI** – False Imprisonment: Participating in Plaintiff's unlawful detention.

**Count VII** – Trespass to Chattels: Mishandling Plaintiff's property.

**Count IX** – Violations of Federal Civil Rights: Violations of **First, Fourth, and**

**Fourteenth Amendments under § 1983.**

2. **IHG Management (Maryland) LLC** As the corporate parent or controlling entity of

Staybridge Suites Hot Springs, IHG may be liable for the conduct of its franchisee or employees

if it exercised control over policies, training, or oversight that led to Plaintiff's removal and the

denial of access to her property. Its failure to prevent or correct the conduct of hotel staff

contributed to the constitutional violations alleged.

**Count II** –  Breach of Contract: If IHG controlled policies affecting Plaintiff's

**64.**

stay.

**Count IV** – Negligence: Failure to supervise or train franchisee staff.

**Count V** –  Intentional Infliction of Emotional Distress: Allowing harmful

conduct to persist.

**Count IX** – Violation of Federal Civil Rights: Vicarious liability if it exercised

control over operations.

**3. Haley Denise Talmon – General Manager of the Hotel at the time of the**

**event.– Conduct as Related to the Counts:** Talmon initiated Plaintiff's removal from the hotel despite

knowing that Plaintiff had paid in full for her reservation. She falsely claimed Plaintiff was trespassing

and called law enforcement to enforce that claim. Talmon did not inform the deputy, she was paid-in-

full, nor did she provide any valid explanation for the removal. After Deputy Matthews left the scene,

Talmon returned Plaintiff's purse without comment and set/dumped her remaining belongings on the

dirt and grass at the edge of the property. This act was degrading, intentional, and interfered with

Plaintiff's possessory interest in her property. Talmon's conduct contributed to Plaintiff's emotional

distress, loss of access to shelter and communication, and the violation of her rights.

**Count I** –  **Breach of Contract:** Removal despite full payment/confirmation.

**Count II** – **Fraud:** Misrepresentation of trespass and concealment of paid-in-full

status.

**Count III** – **Defamation:** False statements to law enforcement implying criminal conduct

65.

**Count V – Intentional Infliction of Emotional Distress:** Coordinated removal,

dumping of belongings, and disregard for Plaintiff's dignity.

**Count VII – Trespass to Chattels:** Intentional interference with Plaintiff's

property.

**Count IX – Civil Conspiracy:** Coordination with law enforcement to effect

unlawful removal, resulting in violations of Federal Civil Rights.

**4. Garland County** Garland County is responsible for the policies, customs, and practices of its

law enforcement agencies. Plaintiff alleges that the actions of Investigator Matthews, deputy at the time

of the event, were carried out pursuant to official policy, custom, or failure to train or supervise, for

which Garland County bears municipal liability under **§ 1983** and ***Monell***.

**Count IV** – Negligence: Failure to train or supervise law enforcement.

**Count VI** – False Imprisonment: Through Deputy Matthews' conduct.

**Count IX** – Violations of Federal Civil Rights: Monell liability for

policies/customs leading to constitutional violations

**66.**

**5. Garland County Sheriff Mike McCormick** (in both his individual and official capacities): As the elected Sheriff of Garland County, McCormick bears responsibility for the supervision, training, and discipline of deputies under his command. Plaintiff alleges that the conduct of Deputy Matthews, now an Investigator, evidences a failure in supervision, training, or disciplinary oversight, for which Sheriff McCormick is liable in his individual and official capacities.

**Count IV – Negligence:** Failure to adequately supervise, train, or discipline Deputy Matthews, who is now, Investigator Matthews, after being promoted approximately 2 months after she sent Sheriff Mike McCormick the detailed email about Defendant Matthews' actions on 10/25/2024.

**Count IX – Federal Civil Rights Violation (§ 1983):** Retaliation against protected speech under color of law; liability attaches to McCormick in both his individual and official capacities.

**6. Investigator Chase Matthews (a deputy, at the time of the incident), individually and in his**

**official capacity** Matthews, acting under color of law, threatened Plaintiff with immediate arrest, if she

attempted to retrieve or search for her missing purse on hotel property. He also refused to allow

Plaintiff to let her cat out of its carrier, despite Plaintiff's concern for the animal's well-being. These

actions, captured on body camera, were made without valid legal cause and constituted unreasonable

seizure and deprivation of liberty and property in violation of the Fourth and Fourteenth Amendments.

Matthews later left the scene, and Plaintiff's belongings were dumped outside on a dirt and grass area

by GM, further compounding the emotional distress and indignity of the encounter.

Deputy Matthews participated in Plaintiff's removal from the hotel despite being

informed that Plaintiff had paid in full for the reservation. His conduct included

repeated threats of arrest, including the statement, *"I am trying very hard not to*

*arrest you,"* which conveyed pressure and emotional coercion. He also threatened

to arrest Plaintiff if she attempted to retrieve her personal belongings, such as her

missing purse. At one point, Matthews stated, *"Nobody around is going to let you*

*stay, so you might as well go on,"* which Plaintiff reasonably interpreted as a

directive to leave Hot Springs, entirely. Given the context — repeated threats of

arrest, Plaintiff's lawful presence, and the deputy's authority — this interpretation

is plausible and supports Plaintiff's claims of intimidation and retaliation under

color of law. Matthews' actions, including his failure to investigate the validity of

the trespassing claim and his compliance with the hotel manager's false narrative,

**68**.

resulted in unlawful detention and violated Plaintiff's constitutional rights.

**Count V – Intentional Infliction of Emotional Distress:** Repeated threats of arrest, coercive language, and emotional harm caused by intimidation.

**Count VI – False Imprisonment:** Unlawful detention and threat of arrest despite Plaintiff's lawful presence.

**Count IX – Violation of Federal Civil Rights (§ 1983):** Acting under color of law in retaliation for Plaintiff's protected speech and perceived identity.

7. **John Does 1–25** Plaintiff reserves the right to name additional defendants as their identities become known through the discovery process. These individuals may have participated in, authorized, or failed to prevent the conduct that led to the constitutional violations alleged herein.

**69.**

## PRAYER FOR RELIEF

**WHEREFORE,** because under Arkansas law, **punitive damages** may be awarded not only for actual harm but also for conduct that shows:

- **Malice**, **reckless disregard**, or **intentional wrongdoing**

- A **willful indifference** to the rights or safety of others

- Harm that **could have occurred**, even if it didn't — especially when the defendant's conduct created a serious risk

The facts support this in several ways:

- The **false 911 call** and threats of arrest created a risk of wrongful incarceration.

- The **forced removal** left plaintiff without shelter, forcing her to sleep in a parking lot — a situation that could have led to physical harm.

The **denial of immediate refund** and need for a second SUV rental caused financial hardship and emotional distress.

Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants: Talmon, Staybridge Suits Hot Springs, (as a fictitious business owned by HS Staybridge Hotel LLC, IHG Maryland, Investigator Chance Matthews, (deputy during event), Garland County, and Garland County Sheriff Mike McCormick, and award the following relief:

1. **Compensatory Damages** For the harms suffered across all nine counts, including:

    - **Contractual damages** for breach of Plaintiff's paid reservation (Count II)

**70.**

- **Procedural abuse damages** for misuse of legal (abuse of process (Count I)

- **Reputational damages** for false statements and public humiliation (Counts III & VIII)

- **Emotional damages** for trauma, anxiety, and distress (Counts IV & V)

- **Damages for interference with physical liberty** and unlawful restraint (Count VI)

- **Property-related damages** for interference with Plaintiff's personal belongings and pet (Count VII)

**Punitive Damages** From **Defendant IHG Management (Maryland) LLC** franchised hotel's the Staybridge Suites Hot Springs' Hotel and General Manager's intentional, malicious, and reckless conduct, including false reporting, public humiliation, and coordinated efforts to deprive Plaintiff of her rights and dignity.  Plaintiff seeks punitive damages in an amount sufficient to deter future misconduct by a corporation operating 4000 of their hotels in the United States, in the amount of **$10 million**, paid jointly and severely, to Plaintiff, because in this case, it is called for in having been intentional, malicious, and reckless, and most of all outrageous.

2. Damages should be significant for the County, for not doing something about this matter, decades, ago, as it was too obvious, not to have noticed, it needed to change.

3. **Nominal Damages** Where applicable, for violations of Plaintiff's rights even absent substantial financial loss, including trespass to chattels and false light.

4. **Costs and Fees** Including reasonable attorney's fees, court costs, and any other expenses incurred in pursuing this action.

5. **Any Other Relief** That the Court deems just and proper under the circumstances, including injunctive or declaratory relief as warranted.

**71.**

That Chance Matthews never be allowed to testify against any individual, in any court, at any time, as long as he lives, due to his failure to protect Plaintiff Parkerson on the day of the event.

And furthermore, that he leave the profession of law, since he lacked the backbone to stand up for what was right. That Plaintiff be supported in developing a long needed plan to realize when the elderly need help, and then, HELP THEM! Have a program to teach law enforcement the human value of elder care in regard to safety, for which there seems to be none. Don't wait for it to happen. Stop it, before it does!

**In 2023, a Garland County deputy fatally shot a man. Two years later, the deputy's name still hasn't been released — prompting Plaintiff to wonder: What else is the Sheriff's Office not telling us? What else is the Sheriff's Office not covering in the way of required education and training for starting deputies to know how to act, and react, at all times, to keep us safe, as well as themselves?**

**We need to contact those leaders and teachers who have gotten the job done the best, wherever they are in our Country and gather up what they know and communicate it to any and all who want to have a part in law enforcement. Their success must be made into success for every County, everywhere. And they must be paid wages high enough, to show how our Society truly appreciates them for risking their lives to make things better for all of us. And then the obvious, we need to weed out those individuals who should not be given our trust nor the responsibility that law enforcement is given, because their words and actions cannot be trusted. And this last**

73.

one applies to all ranks from <u>Deputy</u> to <u>Sheriff</u>, without a doubt.  And once that threshold is crossed, where their office has lost its credibility, that individual must be replaced, immediately.

Sincerely submitted,

_____

Gail Parkerson - acting Pro Se Plaintiff

4726 Central Avenue

Hot Springs, AR. 71913

Phone: 501-617-9004

Email: Trublurain@aol.com

74.

# EXHIBITS

Exhibit A – Reservation Confirmation **Oct. 18, 2024**  Supports Count II - Breach of

Contract.

Exhibit B – Reservation Confirmation **Oct. 25, 2024**  Supports **Count II** - Breach of

Contract.

Exhibit C – 911 Record of Call  Supports **Count I** - Abuse of Process & **Count III** -

Defamation from Plaintiff's FOIA request.

Exhibit D – Enterprise Confirmation for SUV rental ending **October 25, 2024**.

Exhibit E - Enterprise Confirmation for SUV rental beginning **October 25, 2024**.

Exhibit F – Picture of Kitty Lee.  Supports Trespass to Chattels **VII**, supports

Intentional Infliction of Emotional Distress (IIED) Tort of Outrage. **Count V**

Exhibit G – Signed Pet Fee, $75.  Plaintiff paid-in-full.  **Count IV** – Negligence & **VI**.

Exhibit H – Email from Plaintiff Parkerson to Garland County Sheriff Mike McCormick

regarding event at hotel with Deputy Chase Matthews notes included.

**Counts I, II, III, IV, V, VI, VII, VIII, & IX**

Exhibit I – Pictures taken by Plaintiff Parkerson of front of hotel, GM, and plaintiff's

boxes/items, discarded with hanging clothes.  **Count V & Count VII**

Exhibit J – Outside pictures of where defendant relocated plaintiff items including clothes,

**75.**

when she can retrieve those pictures from her phone.

### Count V & Count VII.

Exhibit K- Defendant Talmon's business card, she handed to Plaintiff.   **Count V.**

Exhibit L – Call made to Plaintiffs cell phone number from Staybridge on 10/25/2024.

Exhibit M – Body Cam Video.  This will be made available, as the Court directs.

## Directing Each Summons To:

### 1. HS Staybridge Hotel LLC

- **TO:** HS Staybridge Hotel LLC c/o Shashwat Goyal 704 W. Michigan Street, Stuttgard, AR. 72160                              Send 1+2

### 2. IHG Management (Maryland) LLC

- **TO:** IHG Management (Maryland) LLC c/o Hiq Corporate Services, Inc. 715 St. Paul Street Baltimore, MD 21202

- Serving their **registered agent**, which is legally proper.              Send 1

### 3. Garland County

- **TO:** Garland County, of Arkansas, c/o Garland County Clerk 525 Ouachita Avenue Hot Springs, AR 71901

- The **County Clerk** is the correct recipient for service on the county.  Send 1

**76.**

**4. Sheriff Mike McCormick**

- **TO:** Mike McCormick Garland County Sheriff's Office 525 Ouachita Avenue Hot Springs, AR 71901

- Served at his official workplace, which is valid for both **individual** and **official capacity**. Send 2

**5. Investigator Chase Matthews**

- **TO:** Chase Matthews Garland County Sheriff's Office 525 Ouachita Avenue Hot Springs, AR 71901

- Served at his official workplace, which is valid for both **individual** and **official capacity**.. Send 2

**6. Haley Denise Talmon**

- **TO:** Haley Denise Talmon c/o HS Staybridge Hotel LLC 103 Lookout Circle Hot Springs, AR 71913

- Serve Talmon's and the hotel's summons and complaint to the registered agent Shashwat Goyal at 704 W. Michigan Street, Stuttgart, AR. 72160. Send 3.

Since, Defendants' actions were so malicious, without thought to what their actions could have created for Plaintiff, ranging from Plaintiff being raped to Plaintiff being killed, there should be no hesitation in awarding Plaintiff punitive damages in the amount of $25 million, paid jointly and severely.

77.